UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

FRISBIE MEMORIAL HOSPITAL, SOUTHERN     :
NEW HAMPSHIRE HEALTH SYSTEM,            :
LRGHEALTHCARE, WENTWORTH-               :
DOUGLASS HEALTH SYSTEM, EXETER          :
HEALTH RESOURCES, INC., and ST. JOSEPH  :
HOSPITAL                                :
                                        :
                                        :      CIVIL ACTION No.
Plaintiffs,                             :
                                        :
              v.                        :
                                        :
KATHLEEN SEBELIUS, in her official capacity :
as Secretary of the United States Department of :
Health and Human Services,              :
                                        :
Defendant.                              :

## COMPLAINT

The plaintiffs, by and through counsel, Nixon Peabody LLP, respectfully appeal two

decisions of the defendant, Kathleen Sebelius, Secretary of the United States Department of

Health and Human Services (the "Secretary"), pursuant to the Administrative Procedure Act, 5

U.S.C. § 551 *et seq*.  In support thereof, the plaintiffs state as follows.

## INTRODUCTION

The plaintiffs have suffered a legal wrong as a result of the Secretary's December 13,

2012 decisions approving two State Plan Amendments ("SPAs") to New Hampshire's Medicaid

State Plan: Attachment 4.19-B, Page 1, TN No. 10-014 and Attachment 4.19-A, Page 4, TN No.

10-011 (collectively the "2010 SPAs").  In 2012, during the pendency of related litigation in this

court, the New Hampshire Department of Health and Human Services ("DHHS") substantively

rewrote the 2010 SPAs to include, for the first time, significant changes to the outpatient and

1

inpatient hospital services reimbursement rates and methodologies that were originally made in 2008 (the "2008 rate reductions").  As rewritten in 2012, the 2010 SPAs were not, as a matter of law and historical fact, subject to a valid public notice-and-comment process before their effective dates in accordance with 42 U.S.C. § 1396a(a)(13)(A) ("Section 13(A)") and 42 C.F.R. § 447.205.  Consequently, the Secretary lacked the authority to approve the 2010 SPAs and her decision to approve them was arbitrary, capricious, an abuse of discretion, and contrary to law.

The 2008 rate reductions and the significant methodology changes required to affect them were not subject to a valid Section 13(A) and 42 C.F.R. § 447.205 notice-and-comment process until March 30, 2012, after this court ruled in its March 2, 2012 order that no public process had been provided and expressly ordered DHHS to engage in that process.  The Secretary's subsequent decision to approve the 2008 rate reductions with effective dates of November 19, 2010 violates the law, makes a mockery of the public notice-and-comment process set forth in Section 13(A) and 42 C.F.R. 447.205, and effectively ignores the findings contained in this court's March 2, 2012 order.

Accordingly, the plaintiffs respectfully request that this court hold that the Secretary acted arbitrarily, capriciously, abused her discretion, and acted contrary to law in approving the 2010 SPAs as consistent with Section 13(A) and 42 C.F.R. 447.205 and issue an order declaring the 2010 SPAs void and vacating their approval.

## PARTIES

### Frisbie Memorial Hospital

1. Plaintiff Frisbie Memorial Hospital ("FMH") is a New Hampshire not-for-profit corporation and a healthcare charitable trust, with a principal place of business located at 11 Whitehall Road, Rochester, New Hampshire.

2

2.      FMH is a 112 bed (licensed) acute-care community-based hospital, with a specialty inpatient unit for Geriatric Psychiatry, with about 87 staffed beds, an emergency department, an intensive care unit, a coronary care unit, a medical surgical unit, a women's and children's unit, surgical services and geriatric psychiatric services. FMH operates 14 physician practices, and offers extensive outpatient services.

3.      Its mission is to excel at caring for the community by providing healthcare services that are safe, effective, efficient, equitable, timely and patient centered and to ally with other community healthcare providers to enhance the ability to improve the health of our community and the quality of life for the people FMH serves.

4.      FMH is also the parent corporation of the following Medicaid-approved subsidiaries: (1) the Frisbie Foundation; (2) Stafford Health Alliance; and (3) Seacoast Business and Health.

5.      Pursuant to PSAs with DHHS, FMH provides outpatient and inpatient hospital services to Medicaid beneficiaries itself and through its subsidiaries.

**Southern New Hampshire Health System**

6.      Plaintiff Southern New Hampshire Health System ("SNHHS") is a New Hampshire not-for-profit corporation, with its principal place of business located at 8 Prospect Street, Nashua, New Hampshire.

7.      SNHHS is the parent company of the Southern New Hampshire Medical Center ("SNHMC" or "Medical Center") and Foundation Medical Partners ("FMP," and together with SNHHS and the Medical Center, the "Health System").

8.      SNHHS is a not-for-profit New Hampshire corporation qualified as a charitable organization under 26 U.S.C. § 501(c)(3), and thus exempt from federal income taxation

3

pursuant to Section 501(a) of the Internal Revenue Code of 1986, as amended. SNHHS is the sole member of SNHMC and FMP.

9.      The Health System's mission includes a commitment to improve the health of its community.  Acting as a catalyst for healthy change, the Health System sponsors several programs and community projects, and develops new services. In fiscal year 2006, the Health System provided $11.5 million of financial support to the community, including charity care and subsidized health services.

10.     The Medical Center is a 501(c)(3), not-for-profit New Hampshire corporation that is a community hospital providing emergency care, acute care, specialty services, ambulatory care, and rehabilitation services. The Medical Center currently staffs 158 acute care beds and 30 psychiatric beds totaling 188.  The Medical Center operates a licensed 188-bed hospital in Nashua, on both its Main Campus, predominantly located at 8 and 10 Prospect Street, Nashua, New Hampshire (the "Main Campus"), and its West Campus, located at 29 Northwest Boulevard, Nashua, New Hampshire (the "West Campus"), with other satellite facilities in Nashua and its surrounding communities.

11.     FMP is a 501(c)(3), not-for-profit New Hampshire corporation that is a multi-specialty physician group, which as of December 31, 2006 employed 115 physicians, and has a total complement of 143 physicians.  FMP provides care at the Medical Center and at 12 other sites in the Medical Center's service area.  Its principal place of business is 8 Prospect Street, Nashua, New Hampshire.

12.     SNHHS is therefore comprised of the following Medicaid-approved subsidiaries: SNHMC and FMP.

13.     Pursuant to PSAs with DHHS, SNHHS provides outpatient and inpatient hospital services to Medicaid beneficiaries through its subsidiaries.

**LRGHealthcare**

14.     Plaintiff LRGHealthcare ("LRG") is a New Hampshire not-for-profit corporation and a healthcare charitable trust, with its principal place of business located at 80 Highland Street, Laconia, New Hampshire. LRG owns and operates Lakes Region General Hospital ("LRGH"), which is a 137-bed acute care facility that also provides a full healthcare system for New Hampshire's Lakes Region residents, offering a range of medical, surgical, psychiatric, diagnostic, and therapeutic services, wellness education, support groups, and other community outreach services.  LRGH also maintains swing beds. Swing beds are acute care licensed beds that can be used as nursing home beds which provide LRGH with additional reimbursement for their senior or other long-term care patients.

15.     In addition to LRGH, LRG maintains the Laconia Clinic, P.C., (the "Clinic"), a 28-physician provider-based department (under Medicare) of LRGH.  The Clinic and LRGH operating agreements benefit the community by preserving and enhancing access to a broad range of benefits and medical services. The major components of the Clinic consist of a two-operating room ambulatory surgical center and ancillary services including laboratory, x-ray and physical therapy.

16.     LRG d/b/a Lakes Region General Hospital therefore includes LRGH and the Laconia Clinic, P.C.

17.     Pursuant to PSAs with DHHS, LRG provides outpatient and inpatient hospital services to Medicaid beneficiaries itself and through its subsidiaries.

**Wentworth-Douglass Health System**

18.     Plaintiff Wentworth-Douglass Health System ("Wentworth-Douglass") is a New Hampshire not-for-profit corporation and healthcare charitable trust, with its principal place of business located at 789 Central Avenue, Dover, New Hampshire.

19.     Wentworth-Douglass has four wholly-owned subsidiary corporations: (1) Wentworth-Douglass Hospital; (2) Wentworth-Douglass Physician Corporation ("WDPC"), a not-for-profit New Hampshire corporation which owns and operates primary care and specialty care physician practices; (3) Wentworth-Douglass Hospital and Health Foundation (the "Foundation"), a not-for-profit New Hampshire corporation established for the purpose of securing philanthropic gifts to support the needs of the Hospital; and (4) Wentworth-Douglass Community Health Foundation ("WDCHC") d/b/a The Works Family Health and Fitness Center, a for-profit New Hampshire corporation which operates a health club in Somersworth.

20.     Wentworth-Douglass Hospital is an independent acute care hospital which offers a full range of services typical of a community hospital, as well as several notable specialty services characteristic of a regional hospital.

21.     Pursuant to PSAs with DHHS, Wentworth-Douglass and its subsidiaries provide outpatient and inpatient hospital services to Medicaid beneficiaries.

**Exeter Health Resources, Inc.**

22.     Plaintiff Exeter Health Resources, Inc. ("EHR") is a New Hampshire not-for-profit corporation and a healthcare charitable trust, with its principal place of business located at Five Alumni Drive, Exeter, New Hampshire.  EHR is the health system parent entity.  EHR's

Medicaid Providers are Exeter Hospital, Inc.; Core Physicians, LLC; Exeter Healthcare, Inc.;[1] and Rockingham VNA & Hospice.  The EHR system includes several other organizations, such as a medically-based health and fitness organization, which are not Medicaid providers.

23.     EHR and its Medicaid Providers are exempt from federal income taxation under 26 U.S.C. § 501(c)(3), and are New Hampshire charitable trusts. Exeter Hospital, Inc. is a 100-bed community-based acute care hospital that provides a wide range of medical and surgical services, birthing and reproductive care, emergency services, comprehensive medical and radiological cancer care, and community outreach programs.  Its principal place of business is Five Alumni Drive, Exeter, New Hampshire.  Exeter Healthcare, Inc. was a 27- bed sub-acute care facility that cared for ventilator-dependent and medically complex patients, in addition to providing inpatient rehabilitation.  Its principal place of business was Four Alumni Drive, Exeter, New Hampshire.  Core Physicians, LLC operates a multi-specialty medical group practice with approximately 115 primary care and specialty physicians and other practitioners in 20 locations throughout the Seacoast area.  Its principal place of business is 7 Holland Way, Exeter, New Hampshire.  Rockingham VNA & Hospice is a provider of home care and end-of-life care.  Its principal place of business is 137 Epping Road, Exeter, New Hampshire.

24.     During the time period at issue in this case, EHR was comprised of the following Medicaid-approved subsidiaries: Exeter Hospital, Inc.; Core Physicians, LLC; Exeter Healthcare, Inc.; and Rockingham VNA & Hospice.

25.     Pursuant to PSAs with DHHS, EHR provided outpatient and inpatient hospital services to Medicaid beneficiaries through its subsidiaries.

---

[1] Due to Medicaid funding cuts imposed by New Hampshire, Exeter Healthcare, Inc. was forced to close on September 30, 2012.

**St. Joseph Hospital**

26.     Plaintiff St. Joseph Hospital of Nashua, N.H. ("St. Joseph") is a New Hampshire not-for-profit corporation and a healthcare charitable trust that is referred to as St. Joseph Hospital or St. Joseph Healthcare, with its principal place of business located at 172 Kinsley Street, Nashua, New Hampshire.

27.     St. Joseph is organized as a voluntary corporation under N.H. RSA Chapter 292. It is a Catholic facility that is tax exempt under 26 U.S.C. § 501(c)(3) and is designated as a New Hampshire Charitable Trust as defined by NH RSA § 7:21.

28.     St. Joseph is sponsored and controlled by Covenant Health Systems, Inc., a Massachusetts not-for-profit corporation based in Tewksbury, Massachusetts.

29.     St. Joseph is designated as a Prospective Payment System ("PPS") hospital.  It has one unit, the Inpatient Rehabilitation Unit, that is treated as separate and distinct from the rest of the inpatient units within the hospital.

30.     The mission of St. Joseph is to provide compassionate care that contributes to the physical, emotional, and spiritual well-being of its community of patients, family, friends and neighbors as inspired by the healing ministry of Jesus.

31.     St. Joseph is also comprised of two Medicaid-approved subsidiaries: Souhegan Visiting Nursing Association d/b/a St. Joseph Home and Hospice Care and SJ Physician Services, Inc.

32.     Pursuant to PSAs with DHHS, St. Joseph Hospital provides outpatient and inpatient hospital services to Medicaid beneficiaries itself and through its subsidiaries.

14473931.7

**Defendant**

33.     Kathleen Sebelius is the Secretary of the United States Department of Health and Human Services.  The Secretary has delegated her administrative and decision-making authority over the Medicaid program to the Centers for Medicare and Medicaid Services ("CMS").  The Secretary's business address is United States Department of Health & Human Services, 200 Independence Avenue, S.W., Washington, D.C. 20201.

## JURISDICTION AND VENUE

34.     This action arises under the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

35.     This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 1346(a)(2), as well as under 5 U.S.C. §§ 701-706.  The plaintiffs have suffered a legal wrong as a result of two decisions of CMS issued on December 13, 2012.  On January 25, 2013, the plaintiffs asked CMS to reconsider these decisions.  Through a series of vague and ambiguous correspondences, CMS appeared to indicate that it was entertaining plaintiffs' request that the agency reconsider its December 13, 2012 decisions.  The plaintiffs subsequently learned from the Department of Justice ("DOJ"), however, that CMS was not willing to reconsider its December 13, 2012 decisions.  CMS's decisions are therefore final and subject to judicial review pursuant to 5 U.S.C. §§ 702 and 704.

36.     Venue is also proper in this court pursuant to 28 U.S.C. § 1391(e), and 5 U.S.C. § 703, as there is no special statutory procedure for appeal, and this court is a court of competent jurisdiction.

14473931.7

## BACKGROUND

37.     On November 21, 2008, New Hampshire implemented two significant Medicaid rate reductions without CMS's knowledge, review, or approval, in derogation of the requirements of the Medicaid Act, its regulations, and the New Hampshire Medicaid State Plan.

38.     First, the State reduced the reimbursement rate for outpatient hospital services by slashing the percentage of costs to be reimbursed by 33.48%, from 81.87% to 54.04%.

39.     The State made this significant rate reduction using a state statute, RSA 126-A:3, VII(a),  that has never been incorporated into the State Plan.

40.     Second, the State reduced the reimbursement rate for inpatient hospital services by slashing the DRG price-per-point by 10% using a state statute, RSA 9:16-b, that has never been incorporated into the State Plan.

41.     These rate reductions and the significant methodology changes required to give them effect (collectively the "2008 rate reductions") were not properly noticed and subject to public comment in accordance with 42 U.S.C. § 1396a(a)(13)(A) ("Section 13(A)") and 42 C.F.R. § 447.205 prior to their implementation.

42.     Additionally, the 2008 rate reductions and the significant methodology changes required to give them effect were not reduced to State Plan Amendments ("SPAs") and submitted to CMS for its review and approval.

43.     On July 25, 2011, the plaintiffs filed suit in federal district court seeking declaratory and injunctive relief against the Commissioner of the New Hampshire Department of Health and Human Services ("DHHS").  The plaintiffs alleged, in part, that the 2008 rate reductions violated and conflicted with Section 13(A) and 42 C.F.R. § 447.205 and the Medicaid Act's federal administrative regulatory oversight process, which required that DHHS modify its

10

State Plan to reflect the 2008 rate reduction methodologies and submit them to CMS for its review and approval.

44.     In early January 2012, the district court held an evidentiary hearing on the plaintiffs' motion for preliminary injunction.

45.     At the hearing, the State's Medicaid Director, Katie Dunn, testified.

46.     When asked if a SPA is required to implement a rate reduction, Director Dunn testified, "No, it is not."

47.     When asked if DHHS has a public process in place that complies with Section 13(A), Director Dunn testified that DHHS has no specific Section 13(A) process in place.

48.     When asked if the 2008 outpatient rate reduction was subject to any public notice thirty days prior to its effective date of July 1, 2008, Director Dunn testified that it was not publicly noticed prior to that date.

49.     When asked if DHHS submitted a SPA for the 2008 outpatient rate reduction to CMS, Director Dunn testified that DHHS did not.

50.     When the court asked Director Dunn to identify the methodology in the State Plan that allowed DHHS to slash the percentage of costs by 33.48% for outpatient hospital rates, Director Dunn testified that the methodology was not contained in the approved State Plan and could not otherwise identify it.

51.     Regarding the 2008 inpatient rate reduction, Director Dunn testified that no public notice or comment period was provided prior to that 10% rate reduction being made on November 21, 2008.

52.     On March 2, 2012, this Court (McAuliffe, J.)  issued an order on plaintiffs' motion for preliminary injunction.  *Dartmouth-Hitchcock Clinic v. Toumpas*, 856 F. Supp. 2d 315 (D.N.H. 2012).

53.     With regard to the 2008 rate reductions, the Court found that "the Commissioner followed the Legislature's direction and implemented the inpatient and outpatient rate reductions as a matter of course.  It does not appear that the Commissioner engaged in any effort to notify providers, beneficiaries, or other interested residents of New Hampshire of the impending rate reductions.  Nor did he provide them with an opportunity to be heard before making the rate reductions final." *Id.* at 319.

54.     The court further found that "[t]o be fair, the Commissioner does not seem to argue that he made any purposeful effort to give notice and opportunity to be heard, as contemplated by federal law, before implementing the rate reductions." *Id.*

55.     Judge McAuliffe also found that Section 13(A) provided the plaintiffs with unambiguous statutory rights to notice-and-comment rulemaking. *Id.* at 323-24.

56.     He further found that "[p]laintiffs are likely to succeed on the merits of their Section 13(A) claims. . . . [t]he gravamen of plaintiffs' complaint is that Section 13(A) notice and opportunity to be heard were unlawfully denied them before the Commissioner implemented these substantial rate reductions.  <u>From the evidence presented, that seems highly likely</u>." *Id.* at 324 (emphasis added).

57.     Judge McAuliffe further found that DHHS's position "that, with respect to rate-setting actions, collateral legislative and other political proceedings served as an adequate substitute for the notice and opportunity to be heard required by the [Medicaid] Act – is one that is unlikely to succeed on the merits." *Id.*

12

58.     The Court therefore ordered DHHS to engage in the Section 13(A) public rulemaking process in accordance with the unambiguous statutory requirements of Section 13(A) with regard to the 2008 rate reductions. *Id.* at 326-27.

59.     On March 30, 2012, four years after the implementation of the reduced rates, DHHS published notice of the proposed 2008 rate reductions and the significant proposed methodology changes required to give them effect  in accordance with Section 13(A) and 42 C.F.R. § 447.205.

60.     The notice set forth the proposed 2008 rate reductions, the proposed methodology changes required to effect those rate reductions, and the justifications for those proposed rates and methodology changes.

61.     After the notice issued, the plaintiffs were provided a thirty-day opportunity to comment and did so.

62.     DHHS then published the final rates, the new methodologies underlying the creation of those rates, and the justifications for those rates and new methodologies in early May 2012.

63.     Upon concluding this process, DHHS did not incorporate these newly created rate reductions and significant methodology changes into pending SPAs with effective dates after the March 30, 2012 public notice as federal law requires, *see* 42 C.F.R. §§ 430.12, 447.256(c), but instead sought to backdate these substantive changes by incorporating them into two SPAs that had been pending with CMS since 2010 (the "2010 SPAs").

64.     CMS did not object to this improper backdating.

65.     The 2010 SPAs were originally submitted to CMS on December 28, 2010 and bear effective dates of November 19, 2010.

14473931.7

66.     As originally written in 2010, the 2010 SPAs and the 2010 public notices regarding these SPAs proposed to change only the method of allocation for disproportionate share hospital ("DSH") payments.  They did not purport in any way to change the reimbursement rate for outpatient and inpatient hospital services or the methodologies for calculating those rates.

67.     In fact, the words "inpatient," "outpatient," and "rate" do not even appear in the 2010 public notices.

68.     CMS began scrutinizing New Hampshire's Medicaid program in late 2011 and early 2012, after the plaintiffs filed suit in *Dartmouth-Hitchcock Medical Center v. Toumpas*, 11-cv-358-SM (filed July 25, 2011).

69.     Over the course of the next year, CMS engaged in a closed-doors discussion with DHHS to resolve numerous SPAs that had been pending and unapproved since 2006.

70.     The plaintiffs were not part of this process and had to obtain much of the correspondence between CMS and DHHS through ongoing RSA 91-A Right-to-Know requests.

71.     The documents the plaintiffs received from these requests revealed a dialogue heavily influenced by DHHS's litigation position.  Those documents provided as follows.

72.     At some point in 2012, DHHS attempted to insert the 2008 rate reductions into the pending 2010 SPAs in an effort to make those rate reductions retroactive to 2008.

73.     Specifically, DHHS inserted into the inpatient SPA (Attachment 4.19-A, Page 4, TN No. 10-011) the DRG price per point as it had been reduced on November 21, 2008 and attempted to give that new DRG price per point an effective date of December 1, 2008.

74.     DHHS also inserted into the outpatient SPA (Attachment 4.19-B, Page 1, TN No. 10-014) the actual percentage of costs to be reimbursed as that percentage had been reduced on November 21, 2008 and attempted to give that new percentage an effective date of July 1, 2008.

14

14473931.7

75.     On August 9, 2012, CMS informed DHHS that it lacked the authority to approve a different pending SPA, Attachment 4.19-B, Page 1, TN No. 06-008, ¶1 (the outpatient methodology change required to effect the 2008 outpatient rate reduction), because DHHS had not publicly noticed that significant methodology change prior to its proposed effective date in accordance with 42 C.F.R. § 447.205.

76.     CMS informed DHHS of the limits of CMS's authority:

> Under the regulations at 42 C.F.R. 430.20, the earliest effective date of a SPA may be the first day of the quarter in which it is submitted to CMS.  <u>The regulations at 42 C.F.R. 447.205 clarify that a public notice for changes to methods and standards of reimbursement has to be published prior to the effective date of the SPA.</u>  As such, <u>CMS cannot approve a SPA that contains an effective date for a reimbursement methodology that is</u> (1) earlier than the first day of the quarter in which it was submitted and (2) <u>earlier than the date the public notice was published</u>.

(emphasis added).

77.     CMS further informed DHHS that it could not honor the 2008 effective date language DHHS had attempted to incorporate into the body of the 2010 SPAs.

78.     However, in complete contravention to these statements, and in a decision completely untethered to the requirements of the law, CMS ultimately allowed DHHS to incorporate the 2008 rate reductions and the significant methodology changes required to implement them into the 2010 SPAs with proposed effective dates of November 19, 2010.

79.     On December 13, 2012, CMS approved the 2010 SPAs as materially rewritten in September 2012 to include the 2008 rate reductions with effective dates of November 19, 2010.

80.     The November 19, 2010 effective dates precede the March 30, 2012 Section 13(A) and 42 C.F.R. § 447.205 court-ordered public notice-and-comment process for the 2008 rate reductions by almost a year and a half.

81.     CMS attempted to justify its December 13, 2012 decisions by claiming that the 2010 public notices satisfied the requirements of Section 13(A) and 42 C.F.R. § 447.205 even though the 2010 public notices did not, with respect to the 2008 rate reductions: (1) set forth the proposed rates, proposed methodology changes required to effect those rates, and the justifications for those proposed rates and methodology changes, 42 U.S.C. § 1396a(a)(13)(A)(i); (2) give plaintiffs an opportunity to comment on those proposed rates, methodology changes, and justifications, 42 U.S.C. § 1396a(a)(13)(A)(ii); (3) publish the final rates, final methodology changes, and final justifications for those new rates and methodologies, 42 U.S.C. § 1396a(a)(13)(A)(iii); (4) describe these new, significant proposed methodology changes, 42 C.F.R. § 447.205(c)(1); (5) document the aggregate decrease in expenditures that would inure to the State, 42 C.F.R. § 447.205(c)(2); (6) explain why the defendant was significantly changing the outpatient and inpatient reimbursement methodologies, 42 C.F.R. § 447.205(c)(2); and (7) provide plaintiffs with an opportunity for comment on these significant methodology changes, 42 C.F.R. § 447.205(c)(4-6).

82.     On December 18, 2012, the Secretary, through the United States Department of Justice ("DOJ"), filed her Statement of Interest in *Dartmouth-Hitchcock v. Toumpas*, Docket No. 11-cv-358 (D.N.H.).

83.     In that pleading, the Secretary stated that the Court was better suited to assess whether a Section 13(A) violation had occurred and that such a determination did not require agency expertise. *See Dartmouth-Hitchcock v. Toumpas*, 11-cv-358, ECF No. 113, Statement of Interest of the United States, p. 17 ("If, on the other hand, plaintiffs contend that these SPAs do not comply with Section 13(A) . . . , the Secretary respectfully submits that the doctrine of

16

primary jurisdiction does not apply here and that plaintiffs' Section 13(A) challenge may proceed in the absence of a decision by the Secretary."); *id.* at pp.16-20.

84.     Nonetheless, five days earlier, CMS approved the 2010 SPAs as consistent with Section 13(A) despite this Court's express finding on March 2, 2012 that DHHS failed to comply with the unambiguous statutory requirements of Section 13(A).

85.     The Secretary's Statement of Interest also rested on inaccurate statements about the 2010 SPAs.

86.     For example, the Secretary stated that New Hampshire complied with Section 13(A) because it "publish[ed] notice of the proposed payment rate changes in newspapers of widest circulation in the State."

87.     This statement is incorrect with regard to the 2008 rate reductions.  Nowhere in the 2010 public notices is reference made to the 2008 rate reductions, the proposed rates, or any change in the reimbursement rate or the methods and standards used to determine the reimbursement rate for outpatient or inpatient hospitals services.

88.     The Secretary also suggested that the 2010 public notices "did reference inpatient and outpatient hospital payments."  This statement is also manifestly incorrect.

89.     Even a cursory review of the 2010 public notices demonstrates that they make no reference to inpatient and outpatient hospital payments and, in fact, do not even use the words "inpatient" or "outpatient."

90.     Instead, the Secretary suggested that the terms "supplemental payments" and "Medicaid losses" somehow provided adequate notice of the 2008 rate reductions in accordance with the elements of Section 13(A) and 42 C.F.R. § 447.205 to plaintiffs and Medicaid

beneficiaries that outpatient and inpatient reimbursement rates for hospital services were being reduced.

91.     In fact, the language referenced by the Secretary does not, and was never intended to, constitute notice to Medicaid providers and beneficiaries that outpatient and inpatient hospital reimbursement rates were being reduced by 33.48% and 10% respectively in 2010 in part because these rate reductions were not made in 2010.

92.     Indeed, the Secretary actually explained why the 2010 public notices could not comply with the unambiguous requirements of Section 13(A).

93.     The Secretary stated that "[t]o be sure, plaintiffs are correct that the November 14, 2010, public notice did not identify the precise payment rate for inpatient and outpatient hospital services."

94.     The Secretary further stated that "[i]t was thus only later that the State incorporated the base payment rates for inpatient and outpatient hospital services into [the 2010 SPAs], meaning it would have been impossible to specify those precise rates in the November 2010 public notice."

95.     Identifying the precise proposed rate is, however, an unambiguous statutory requirement of Section 13(A) that the Secretary necessarily admits could not have been complied with prior to 2012. *See* 42 U.S.C. § 1396a(a)(13)(A)(i).

96.     On December 20, 2012, this Court held a hearing in *Dartmouth-Hitchcock v. Toumpas*, Docket No. 11-cv-358 (D.N.H.).

97.     At the hearing, the Court indicated that CMS's approval of the 2010 SPAs appeared to mean that the 2008 rate reductions were void from July 1, 2008 to November 19, 2010.

98.     Through counsel, DHHS disagreed and the following colloquy ensued regarding

the 2008 rate reductions:

THE COURT:          Why am I wrong?  I thought CMS said we've looked at that
                    SPA and we've approved it back to 2010.  It's not approved
                    back to 2008.  And in order to reduce the rates you have to
                    have CMS approval.  33 percent is a material change.  You
                    have to get their approval.  Absent their approval, it's not
                    effective.  What am I missing?

ATTORNEY SMITH:         The approved State Plan methodology allowed the
                        state to adjust the rates. There were –

THE COURT:          You mean without putting in a SPA?

ATTORNEY SMITH:         Yes.

THE COURT:          Then why did you put one in?

ATTORNEY SMITH:         There was [a SPA] put in in 2010 which addressed
                        other changes in the rate methodology, and because
                        CMS looking at those provisions and the direction
                        that regulation has gone wants more specificity in
                        the State Plan they asked us to specify – to be more
                        specific about the methodology and ultimately to
                        add the specific rates that were historical rates that
                        were being used.

                        So when they approved the 2010 SPAs – when you
                        look at those approval letters they acknowledge that
                        they are approving the currently existing rates.
                        They did not say that those rates were ineffective or
                        disapproved going backwards.  They acknowledge
                        that they were approving rates that were currently in
                        use.

THE COURT:          That makes no sense to me.  I don't even know what you
                    said. …

(emphasis added).

99.     In the above colloquy, DHHS, through counsel, admitted that the 2010 SPAs

addressed changes other than the 2008 rate reductions.

100.    When asked by the Court whether DHHS filed a SPA in 2010 to make the 2008 rate reductions, DHHS's counsel again represented that the 2010 SPAs "sought approval for <u>other changes</u> to the inpatient methodology and outpatient methodology." (emphasis added).

101.    The Court then engaged in the following discussion with DHHS's counsel regarding public notice and the filing of SPAs for the 2008 rate reductions:

> THE COURT:            So you're in the same position you've been all along.  We don't have to do that.  We didn't do it.  We don't have to do it.
>
> ATTORNEY SMITH:        Correct.
>
> THE COURT:            That's your position.
>
> ATTORNEY SMITH:        Correct.
>
> THE COURT:            That we did it, whatever, but we didn't have to.
>
> ATTORNEY SMITH:        Correct.
>
> THE COURT:            Okay.  That doesn't strike me as correct.  Did not the injunction on the 13(A) – didn't that – did that injunction not cover these changes?
>
> ATTORNEY SMITH:        It did.  <u>And we gave the notice</u>.  **<u>That was the notice</u>**.  <u>But we didn't do another SPA as a result of giving that notice because we were already talking to CMS about putting those same rates in the 2010 SPAs</u>.  So they were already in SPAs that were in progress in the –

(emphasis added).

102.    In other words, DHHS engaged in a Section 13(A) and 42 C.F.R. § 447.205 public notice-and-comment process for the 2008 rate reductions for the first time on March 30, 2012, but was permitted by CMS to incorporate the 2008 rate reductions into the 2010 SPAs,

which pre-dated the March 30, 2012 court-ordered public notice-and-comment process by

almost a year and a half.

103.    The court also engaged in a dialogue with the DOJ regarding whether DHHS had

complied with Section 13(A) and the SPA submission process as to the 2008 rate reductions:

ATTORNEY BERWICK:          The problem here, your Honor, is the
                           Secretary doesn't have [the ability] to make
                           that determination because no state plan
                           amendment was filed.

THE COURT:        Of course. Well, that's the fly in the ointment because the
                  way New Hampshire has operated this thing is, sure, you're
                  going to escape review because you're never going to ask
                  for it.

ATTORNEY BERWICK:          Well, I think that's partially accurate, your
                           Honor. Although to the extent the State did
                           not comply – accepting the presumption the
                           state did not comply with 13 (A) –

THE COURT:        **Well, they did not comply with Section 13(A)**.  The
                  question is did they have to.  Well, that begs the following
                  question.  I don't know.  Is this a material change?  They
                  say no.  The Secretary says, I don't know, nobody asked
                  me and it's too late now.

ATTORNEY BERWICK:          Well, to that your Honor, I would say that if
                           the change as the plaintiffs describe it is
                           accurate – in other words, if there was a
                           reduction of rates in 2008 that did require a
                           State Plan Amendment, to the extent the
                           State did not submit one that was not
                           compliant with federal law.

104.    The above dialogue demonstrates that the 2008 rate reductions not only violated

Section 13(A) but also violated the Medicaid Act's federal regulatory oversight scheme.

105.    On January 25, 2013, the plaintiffs filed a request for reconsideration with CMS

demonstrating why the 2010 SPAs as materially rewritten by DHHS in 2012 could not comply

14473931.7

with Section 13(A) and 42 C.F.R. § 447.205 and why CMS's December 13, 2012 decision

conflicted with the court's March 2, 2012 order.

106.    CMS appeared to indicate that it was considering this request for reconsideration.

107.    The DOJ further represented that CMS had taken the plaintiffs' request to DHHS

for its input.

108.    CMS appeared to communicate that it was considering the plaintiffs' request.

109.    The DOJ subsequently informed the plaintiffs of CMS's position that it did not

have the authority to consider the plaintiffs' request.

110.    Accordingly, the plaintiffs have exhausted their administrative remedies, and

CMS's December 13, 2012 decisions are final and subject to judicial review.

## COUNT I

### Arbitrary and Capricious Agency Action Under
### 5 U.S.C. §§ 706(2)(A)

111.    The plaintiffs incorporate by reference and reallege the foregoing allegations as if

fully set forth herein.

112.    5 U.S.C. § 706(2)(A) grants this Court the power to hold unlawful and set aside

any agency actions, findings and conclusions found to be "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law."

113.    "States are not obligated to participate in Medicaid, but must rigidly comply with

several federally-imposed requirements if they opt to do so." *Consejo De Salud De La*

*Comunidad De La Playa De Ponce, Inc., CDT v. Lorenzo Gonzalez-Feliciano*, 695 F.3d 83, 87

(1st Cir. 2012).

114.    "Before granting approval, [CMS] reviews the State's plan and amendments to

determine whether they comply with the statutory and regulatory requirements governing the

22

Medicaid program." *Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, __ U.S. __, 132 S. Ct. 1204,

1208 (2012).

115.    One of these federally imposed statutory requirements is that a state establish and

provide "a public process for the determination of rates of payment for hospital services."  42

U.S.C. § 1396a(a)(13)(A); *see* 42 C.F.R. § 447.205.

116.    This public process requires, at a minimum, that States meet the following

unambiguous rulemaking requirements before they determine rates of payment for hospital

services:

> (i) proposed rates, the methodologies underlying the establishment of such rates, and justifications for the proposed rates are published,
>
> (ii) providers, beneficiaries and their representatives, and other concerned State residents are given a reasonable opportunity for review and comment on the proposed rates, methodologies, and justifications,
>
> (iii) final rates, the methodologies underlying the establishment of such rates, and justifications for such final rates are published, and
>
> (iv) in the case of hospitals, such rates take into account (in a manner consistent with section 1396r-4 of this title) the situation of hospitals which serve a disproportionate number of low-income patients with special needs . . . .

42 U.S.C. § 1396a(a)(13)(A).

117.    42 C.F.R. § 447.205 provides a similar public notice requirement that requires

States to "provide public notice of any significant proposed change in its methods and standards

for setting payment rates for services."

118.    The content of the notice must:

> (1) [d]escribe the proposed change in methods and standards;
>
> (2) [g]ive an estimate of any expected increase or decrease in annual aggregate expenditures;
>
> (3) [e]xplain why the agency is changing its methods and standards;

23

(4) [i]dentify the local agency in each county (such as the social services agency or health department) where copies of the proposed changes are available for public review;

(5) [g]ive an address where written comments may be sent and reviewed by the public; and

(6) [i]f there are public hearings, give the location, date and time for hearings or tell how this information may be obtained.

119.    The notice must then:

(1) [b]e published before the proposed effective date of the change; and

(2) appear as a public announcement in one of the following publications:

(i) [a] State register similar to the Federal Register;

(ii) [t]he newspaper of widest circulation in each city with a population of 50,000 or more; or

(iii) [t]he newspaper of widest circulation in the State, if there is no city with a population of 50,000 or more.

42 C.F.R. § 447.205(d) (emphasis added).

120.    Recognizing that Section 13(A) and 42 C.F.R. § 447.205 are substantially similar, the United States Department of Health and Human Services has stated its position in a 1997 letter to State Medicaid Directors that "whatever public process states elect to implement which meets the requirements of the new [Section 13(A)] will satisfy HCFA's general requirements on public notice at 42 C.F.R. § 447.205, provided that states publish their proposed rates, methodologies underlying the establishment of such rates, and justifications for the proposed rates prior to the effective date of the new amendments." (emphasis added).

121.    Section 13(A)'s public process requirement confers unambiguous notice-and-comment rulemaking rights on providers of hospital services and Medicaid beneficiaries. *Dartmouth-Hitchcock Clinic v. Toumpas*, 856 F. Supp. 2d 315, 323-24 (D.N.H. 2012) ("Section

(13)(A), by its terms, seems to unambiguously afford providers and beneficiaries a private right

of action."); *see also Long Term Care Pharm. Alliance v. Ferguson*, 362 F.3d 50, 54 (1st Cir.

2004) ("*Long Term Care*") ("Broadly speaking, subsection (13)(A) requires something on the

order of notice and comment rulemaking for states in their setting of rates for reimbursement of

'hospital services . . .' provided under the Medicaid Act.").[2]

122.    This public process requirement must be complied with <u>before</u> state officials

change the rate of payment for providers of hospital services. *See* 42 U.S.C. §

1396a(a)(13)(A)(i-iii); 42 C.F.R. § 447.205(d); *Long Term Care*, 362 F.3d at 54 (indicating that

perhaps in emergency situations "subsection 13(A) may not automatically require notice and

comment <u>before</u> a new rate goes into effect") (emphasis added).

123.    Any failure to afford the public rulemaking process set forth in Section 13(A) and

42 C.F.R. § 447.205, including the failure to publish the proposed rates and the proposed

methodology changes prior to their effective dates, renders the resulting rates and

methodologies and the SPAs they have been incorporated into invalid and void.  *See, e.g.*, *N.C.,*

*Dep't of Human Servs., Div. of Med. Assistance v. United States Dep't of Health & Human*

*Servs.,* 999 F.2d 767, 771-72 (4th Cir. 1993) (Powell, J., sitting by designation) ("Nothing in the

federal regulations [42 C.F.R. §447.205] permits a harmless error exception to the requirement

that a State publish advance public notice of significant changes to a State's Medicaid rate

setting methodology."); *Independent Nursing Home v. Simmons*, 732 F. Supp. 684, 690 (S.D.

Miss. 1990) ("The purpose of the notice requirement is to assure public awareness of the

---

[2] *See also Fla. Ass'n of Rehab. Facilities, Inc. v. Dep't of Health & Human Rehab. Servs.,* 526 F.3d 685, 690 (11th
Cir. 2008) (recognizing Section 13(A)'s procedural requirements); *Evergreen Presbyterian Ministries v. Hood*, 235
F.3d 908, 919 n.12 (5th Cir. 2000), *overruled on other grounds by Equal Access for El Paso, Inc. v. Hawkins*, 509
F.3d 697, 704 (5th Cir. 2007) (same); *Children's Seashore House v. Waldman,* 197 F.3d 654, 660 (3d Cir. 1999),
*cert. denied*, 530 U.S. 1275 (2000) (same).

proposed change and to allow the interested parties an opportunity to comment on the change whether it be in support or in opposition to the proposal. This the plaintiffs did not have an opportunity to do, and thus the court finds that transmittal 84-36 which altered the method by which DOM computed reevaluation of assets and recapture of depreciation constituted a significant change requiring public notice pursuant to 42 C.F.R. § 447.205. Accordingly, the court finds that transmittal 84-36 is void and of no effect for failure of the defendant to promulgate said amendment in compliance with federal law."); *Wisconsin Hosp. Ass'n v. Reivitz,* 630 F. Supp. 1015, 1023 (E.D. Wis. 1986), *aff'd in pertinent part, vacated in part*, 820 F.2d 863 (7th Cir. 1987) (absence of notice before freezing Medicaid payment rates rendered legislation void under 42 C.F.R. § 447.205).

124.    This result is consistent with the plain language of Section 13(A) and the position CMS has taken for years that, under 42 C.F.R. § 447.205(d), States must publish <u>adequate notice</u> of significant proposed methodology changes <u>prior to their effective dates</u> for them to be valid and enforceable.  *See State v. Shalala*, 42 F.3d 595, 602 (10th Cir. 1994) ("The [HCFA] Administrator disagreed that either a public ratemaking process or actual notice could substitute for 'at least minimal compliance' with section 447.205. He said that even if all effected parties had actual notice, the State <u>must publish 'an appropriate public notice before the effective date of the proposed change</u>.'") (emphasis added); *see Illinois v. Shalala*, 4 F.3d 514, 517 (7th Cir. 1993) (where effected parties had actual notice of a legislatively mandated plan amendment, "at least minimal compliance with section 447.205(d)'s requirement of publication <u>before the proposed effective date</u>" was still required) (emphasis added).

125.    Applying the above principles of law to the facts of this case, the 2010 public notices do not meet any of the unambiguous statutory requirements of Section 13(A) or any of

the regulatory requirements of 42 C.F.R. § 447.205 with regard to the 2008 rate reductions and the significant methodology changes required to effect them.

126.     First, the 2010 public notices do not set forth the proposed 2008 rate reductions, the proposed methodology changes required to establish those rate reductions, or the justifications for those proposed rate reductions and significant methodology changes. 42 U.S.C. § 1396a(a)(13)(A)(i).

127.     Second, the 2010 public notices could not have given providers, beneficiaries, and other concerned State residents a reasonable opportunity for review and comment on the proposed rates, methodology changes, and justifications because the notices fail to even mention the proposed 2008 rate reductions, the proposed methodology changes required to make the 2008 rate reductions, and the justifications for the 2008 rate reductions.  42 U.S.C. § 1396a(a)(13)(A)(ii).

128.     Third, the final rates, the significant methodology changes underlying the establishment of the final rates, and the justifications for the final rates with regard to the 2008 rate reductions were never published until May 2012, following the March 30, 2012 court-ordered public notice. 42 U.S.C. § 1396a(a)(13)(A)(iii).

129.     The 2010 public notices also do not meet any of the requirements of 42 C.F.R. § 447.205(c), even under the most generous reading of that regulation.

130.     First, the 2010 public notices did not even reference that the reimbursement methodologies for outpatient and inpatient hospital services were being changed (let alone describe the changes being made in any detail).  42 C.F.R. § 447.205(c)(1).  In fact, the two 2010 public newspaper notices stated the exact opposite: "There is no change in methodology used to determine the total amount of funds available for these payments under state law; . . . ."

27

131.    Second, no estimated increase or decrease in annual aggregate expenditures was provided.  42 C.F.R. § 447.205(c)(2).  There was plainly a cost decrease in annual aggregate expenditures as a result of the 2008 rate reductions because the State implemented them for the sole purpose of saving money and balancing the State's budget in 2008.  Nonetheless, the two 2010 public newspaper notices accompanying the 2010 SPAs state: "There is no fiscal impact associated with this change."

132.    Third, the 2010 public notices do not reference that DHHS is seeking to change the outpatient and inpatient hospital services reimbursement rate methodologies.  42 C.F.R. § 447.205(c)(3).

133.    Finally, the 2010 public notices do not comply with the requirements of 42 C.F.R. § 447.205(c)(4-6) with regard to the 2008 rate reductions and the significant methodologies required to give them effect because the notices themselves did not even reference the 2008 rate reductions or the significant methodology changes required to effect them.

134.    CMS itself has stated that it lacks the authority under 42 C.F.R. 447.205(d)(1) to approve a SPA that contains an effective date for a reimbursement methodology that is earlier than the date the applicable public notice was published.

135.    Accordingly, because the 2010 SPAs as materially rewritten in 2012 to incorporate the 2008 rate reductions fail to comply with the requirements of Section 13(A) and 42 C.F.R. § 447.205, CMS acted arbitrarily and capriciously, abused its discretion, and did not act in accordance with law when it approved the 2010 SPAs as consistent with Section 13(A) and 42 C.F.R. § 447.205.

136.    As a result, the plaintiffs have suffered a legal wrong.  Because the 2008 rate reductions were never promulgated in accordance with the requirements of the Medicaid Act, its regulations, or the State Plan, they have been void from their inception to the present day.

137.    Since 2008, the plaintiffs have been entitled to be reimbursed in accordance with reimbursement rates that have been properly promulgated under the Medicaid Act, its regulations, and New Hampshire's State Plan from 2008 to the present.

138.    The plaintiffs can recover these sums in state court by way of an action for breach of contract.

139.    CMS's arbitrary and capricious decision to approve the 2008 rate reductions effective as of November 19, 2010 has effectively limited plaintiffs' recovery on their breach of contract claims from July 1, 2008 to November 19, 2010 and has therefore deprived the plaintiffs of at least $20 million in Medicaid reimbursements from November 19, 2010 to the present.

WHEREFORE, the plaintiffs respectfully request that this Court:

A. Hold that CMS acted arbitrarily and capriciously, abused its discretion, and acted contrary to law pursuant to 5 U.S.C. § 706(2)(A) when it approved the 2010 SPAs as materially rewritten in 2012 to incorporate the 2008 rate reductions and the significant methodology changes required to effect them as consistent with Section 13(A) and 42 C.F.R. § 447.205;

B. Vacate CMS's December 13, 2012 decisions approving the 2010 SPAs (Attachment 4.19-B, Page 1, TN No. 10-014 and Attachment 4.19-A, Page 4, TN No. 10-011) with effective dates of November 19, 2010;

C. Declare the 2010 SPAs void and of no effect; and

D. Granting such other relief as the court deems just and equitable.

Respectfully submitted,

**PROVIDER PLAINTIFFS**,

29

By their Attorneys,
**NIXON PEABODY LLP**

Dated:  October 9, 2013                    /s/ W. Scott O'Connell
                                           W. Scott O'Connell, Esq., N.H. Bar No. 9070
                                           Gordon J. MacDonald, Esq., N.H. Bar No. 11011
                                           Emily P. Feyrer, Esq., N.H. Bar No. 20434
                                           Anthony J. Galdieri, Esq., N.H. Bar No. 18594
                                           900 Elm Street, 14th Floor
                                           Manchester, NH  03101-2031
                                           TEL:  (603) 628-4000
                                           soconnell@nixonpeabody.com
                                           gmacdonald@nixonpeabody.com
                                           efeyrer@nixonpeabody.com
                                           agaldieri@nixonpeabody.com

14473931.7